# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WISCONSIN

SHEILA SCHULZ

          Plaintiff,

v.                                    Case No.  09-CV-298

GREEN COUNTY, WISCONSIN

          Defendant.

## PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Fed. R. Civ. P. 56, Plaintiff Sheila Schulz, by her counsel, Garvey McNeil & Associates, S.C. and the Law Office of Lawrence Bensky, LLC, submits the following brief in response to Defendant's memorandum of law in support of its motion for summary judgment.

## INTRODUCTION

This is a civil action brought pursuant to 42 U.S.C. § 1983 seeking damages and equitable relief on behalf of Plaintiff for claims arising out of the Fourteenth Amendment to the United States Constitution.  This action alleges Green County wrongfully discharged plaintiff Sheila Schulz without due process of law. Defendant has admitted Ms. Schulz had a property interest in her job created by

statue statute and protected by the Constitution; however, it argues Ms. Schulz was not entitled to due process because it terminated her pursuant to a *bona fide* governmental reorganization.

Defendant assumes that transferring juvenile intake services from the circuit court to the county Human Services Department ("the Department") with the intention of saving money justified terminating Ms. Schulz. However, the "reorganization defense" is not as simple as Defendant argues. Missing from Defendant's brief and proposed findings of fact are facts to prove Ms. Schulz's position was actually abolished, and facts to prove it engaged in a *bona fide* reorganization. Factors that may establish a reorganization defense are identified in the substantive law and are the Defendant's burden to prove.

In arguing that Green County has failed to meet its burden of demonstrating it engaged in a *bona fide* reorganization and was thus exempt from the statutory and constitutional due process requirements, Plaintiff highlights the elements of the reorganization defense that have been created in the common law, and supplies additional proposed facts demonstrating why Green County cannot prove it satisfies those elements.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if the evidence on record shows "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "Genuine" issues are those

upon which "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248, 106 S.Ct. 2505 (1986). "Material" facts are identified by the substantive law of the case. *Id.* "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* (citations omitted).

After a moving party demonstrates "that there is an absence of evidence to support the nonmoving party's case," the burden shifts to the non-moving party to establish, beyond the pleadings, that there is a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25, 106 S.Ct. 2548 (1986). In ruling on summary judgment, all inferences must be drawn in the light most favorable to the non-moving party. *Baron v. City of Highland Park*, 195 F.3d 333, 338 (7th Cir. 1999).

In the present case, Defendant has not presented facts sufficient to prove it is entitled to judgment as a matter of law. Further, genuine issues of material fact preclude summary judgment in its favor. Therefore, the Defendant's motion must be denied.

## **FACTS**[1]

Plaintiff Sheila Schulz served as Green County's chief juvenile intake worker since 1997, working at the Green County circuit court under the supervision of the Honorable James Beer. (PFOF ¶¶ 9-11.) In that position, she provided services mandated by Wisconsin statutes chapters 48 and 938. (*Id.*) Her duties included

---

[1] Plaintiff relies on the facts set forth in her Response to Defendant's Proposed Findings of Facts and the Plaintiff's Statement of Additional Proposed Findings of Fact. The following is a summary.

removing delinquent and abused children from their homes and placing them into custody, providing crisis counseling and making recommendations regarding final disposition of juvenile matters. (PFOF ¶ 6.) On September 30th 2008, the County's Finance Committee—chaired by Harvey Mandel, who also sits on the County's Personnel Committee—informed Ms. Schulz it was considering transferring juvenile intake services to the Children, Youth, and Families Unit ("CYF Unit") of the county human services department (the "Department"). (P's Resp. to PFOF ¶ 35.)

During an October 29, 2008 personnel committee meeting, several people from the community, including police chiefs, school district officials, and attorneys, spoke on behalf of keeping juvenile intake services court attached. (PFOF ¶¶ 43, 44.) Many of the people who spoke provided written correspondence to the Committee. (*Id*.) A handful of these letters are critical of the services provided by the Human Services Department; none of these letters criticize any specific Human Services employee. (APFOF ¶ 81.)

A few weeks later, on November 19, 2008, the personnel committee met in closed session in violation of Wisconsin's open meeting's law to discuss the juvenile intake function. (APFOF ¶¶ 81-93.) Upon reconvening in open session, the committee passed a measure eliminating Ms. Schulz's position and creating a new juvenile intake position in the Department. (PFOF ¶ 48; APFOF ¶¶ 92-93.) This resolution passed the full county board on December 9, 2008. (PFOF ¶ 49.)

In order to mitigate her damages, Ms. Schulz applied for a handful of other jobs, including the "new" juvenile intake position with the County. (PFOF ¶ 57;

APFOF ¶ 97.)  She was allowed to submit her application after a union posting period had ended and nobody from the bargaining unit had "posted in."  (PFOF ¶ 55.)  Ms. Schulz had a two-hour interview with Greg Holcomb, Director of Human Services, and Dee Jaye Miles, supervisor of the CYF Unit, and was later offered the juvenile intake position in the Department.  (PFOF ¶ 58; P.'s Resp. to PFOF ¶ 58.)  In the new position, Ms. Schulz performs substantially similar duties but receives a much lower salary and was placed at the bottom of the "lay-off" seniority list.  (PFOF ¶¶ 24, 65; APFOF ¶¶ 6, 113.)

In transferring juvenile intake services from the circuit court to the Department, the Defendant did not actually eliminate Ms. Schulz's position; it moved it to another department.  (APFOF ¶¶ 4-7.)  At that same time, the CYF Unit supervisor Dee Jaye Miles assumed Ms. Schulz' former title as chief intake worker.  (P's Resp. to PFOF ¶ 51.)  The County spent little time considering the transfer of services, gave little consideration to how it would structure delivery of services and did not seriously evaluate whether the transfer of services would achieve cost-savings.  (APFOF ¶¶ 8-16, 19, 20-26.)  By contrast, Green County recently transferred its two emergency management ("EMS") employees from the Veteran's Services Department to the Sheriff's Department.  (APFOF ¶ 101.)  This transfer of services was discussed and studied for over two years, the departments involved engaged in cooperative planning related to the transfer of services, and the employees involved maintained their positions at no reduction in salary.  (APFOF ¶ 102-105.)

## ARGUMENT

The defendant concedes Ms. Schulz had a property interest in her job by way of the Wisconsin Statutes and guaranteed by the federal Constitution, but argues the common law reorganization exception preempts these statutory protections under the present circumstances. (Def. Br. at 5-6.) In so arguing, Defendant does not address primary components of the common law defense but nevertheless concludes it engaged in a *bona fide* reorganization.

## I.    Plaintiff's Constitutional Due Process Rights

In her 42 U.S.C. § 1983 claim, Ms. Schulz alleged Green County deprived her of property without due process of law, contrary to the 14th Amendment to the U.S. Constitution. (Compl. ¶ 1.) Procedural due process claims employ a two-prong test: (1) whether the plaintiff has been deprived of a protected property interest and (2) whether the deprivation was without due process. *Evans v. Morgan*, 304 F. Supp. 2d 1100, 1104 (W.D. Wis. 2003).

As an intake worker appointed to provide services under chs. 48 and 938 of the Wisconsin Statutes, Ms. Schulz could only be removed for cause. Wis. Stat. §17.10(6)(b). As a result, she had a property interest in her employment. *Cleveland Bd. of Ed. v. Loudermill*, 470 U.S. 532, 538-39 (1985); *Bd. of Regents v. Roth*, 480 U.S. 564, 577 (1972). Ms. Schulz was terminated without procedures sufficient to satisfy the 14th Amendment's due process requirements. (Compl., ¶¶ 22, 35-37, Dkt 1; P's Resp. to PFOF ¶¶ 48-49.) Notice of charges and an opportunity to respond are essential elements of due process. *Loudermill*, 470 U.S. at 542. In this case, Ms. Schulz was

removed from office without being afforded the due process guaranteed by the 14th Amendment.  (Compl., ¶¶ 22, 35-37, Dkt 1; P's Resp. to PFOF ¶¶ 48-49.)

Green County does not dispute that Ms. Schulz had a protected interest in her employment.  (Def.'s Proposed Conclusions of Law, ¶¶ 1, 2; Def. Br. at 5-6.)

## II.    The reorganization exception does not defeat Plaintiff's due process claim

Wisconsin and Seventh Circuit courts have recognized an exception to due process requirements when a municipal employer has discharged an employee as part of a governmental reorganization.  *Misek v. City of Chicago*, 783 F.2d 98, 100 (7th Cir. 1986); *Campana v. City of Greenfield*, 164 F. Supp. 2d 1078, 1092 (E.D. Wis. 2001)(citing *State ex rel. Thein v. City of Milwaukee*, 229 Wis. 12, 12, 281 N.W. 653 (1938)) *aff'd*, 38 Fed.Appx.339, 2002 WL 1370055 (7th Cir. June 24, 2002). When a court determines a defendant engaged in a *bona fide* reorganization, the plaintiff is not entitled to the pre-discharge due process protections that would apply if no reorganization had occurred.  However, "this exception only applies if the governmental reorganization is 'legitimate,'" and "[a] municipality cannot cry reorganization in order to circumvent constitutional and statutory protections." *Campana*, 164 F. Supp. 2d at 1092-92 (citing *Garrett v. Barnes*, 961 F.2d 629, 634 (7th Cir. 1992); *Misek*, 783 F.2d at 101; *Thein*, 281 N.W. at 656 (stating "civil service laws are not to be evaded by a sham abolition of an old position for the purpose of ousting an incumbent").

Though Wisconsin or Seventh Circuit courts have not enumerated specific factors that courts must always consider in determining whether a "legitimate"

7

governmental reorganization in fact occurred, the courts generally agree that a "critical fact" tending to show whether a reorganization in fact occurred is whether the plaintiff's position was actually abolished.  *Conine v. City of Marinette*, 1994 WL 592188 (Wis. App., Nov. 1, 1994)(explaining *Misek*); *Unger v. Gregory*, 249 Wis. 161, 163, 23 N.W.2d 480 (1946) (explaining a new position cannot be created by giving a new title to an old position involving the same duties, because a name change with no change in duties indicates bad faith in creating the new position)(citing *Thein*, 281 N.W. 563).  To determine whether a position has actually been abolished, courts consider whether the new position demands greater responsibility, greater or different qualifications or education, and additional or different duties.  *Thein*, 281 N.W. at 656.  In other words, a municipal employer may not simply state it is abolishing or eliminating a position and be entitled to a finding that it engaged in a legitimate governmental reorganization.  When a government purports to eliminate a position, and removes a for-cause employee as a result, it must prove the position was truly eliminated by demonstrating that it did not create a "new" position to assume substantially the same duties as the position it claimed to abolish.  *Unger*, 249 Wis. at 163 (citing *Thein,* 281 N.W. at 655-56).

For example, in *Thein*, an early reorganization case, the Wisconsin Supreme Court concluded the Plaintiff's "old" position had been eliminated and a "new" position created, because the new position required greater qualifications and was

intended to impose a substantial degree of additional duties.[2]  281 N.W. at 654-56.

In *Unger v. Gregory*, the government engaged a civil service classification examiner

to study the duties of the positions.  249 Wis. at 164-65.  The examiner determined

the duties of the new position were substantially different from those of the old.  *Id.*

In *Campana v. City of Greenfield,* the court found the new position required different

qualifications and duties.  164 F.Supp.2d at 1094.   In *Nelms v. Modisett*, the court

found on summary judgment that the undisputed facts showed that the plaintiff's

position had been abolished, and that nobody had been hired in his place. 153 F.3d

815, 821 (7th Cir. 1998).  In *Conroy v. City of Chicago*, it was undisputed that the

responsibilities of the old position and the new position were "completely

different."  708 F.Supp. 927, 944 (N.S. Ill. 1989).  In *Limes-Miller v. City of Chicago,* the

court found that "no one at all was hired to replace" the plaintiff.  773 F. Supp. 1130,

1140 (N.D. Ill 1991).  In other cases it was undisputed that the plaintiff's position was

actually abolished, and the plaintiffs did not claim otherwise.  *State ex. rel. Miller v.*

*Baxter,* 171 Wis. 193, 176 N.W. 770, 771 (1920); *McCartney*, 166 Wis. 2d at 969;  *Felde v.*

*Town of Brookfield*, 570 F.Supp.2d 1070, 1075 (E.D. Wis. 2008).  In *Misek*, the 7th Circuit

reversed dismissal on the ground that the plaintiffs asserted that their jobs were

never abolished, distinguishing cases in which "the plaintiffs admitted that their

---

[2] In *Thein*, the department of public works originally employed specialized inspectors to handle specific divisions:  inspector of electric and gas installation, inspector of dredging and docks, inspector of highways, inspector of sewer construction, inspector of tunnel construction.  281 N.W. at 654.  The public works commissioner decided to abolish the old positions and create new "public works inspector" positions.  Persons in the new positions were required to inspect all public works, including paving, sewers, water pipes, tunnels, etc.  *Id.*

jobs had been abolished and that a reorganization had in fact taken place." 783 F.2d at 101.

Other federal courts have similarly examined whether the plaintiff's position had been abolished. In *Hartman v. City of Providence*, the Court noted the evisceration of these duties "caused one of the plaintiff's most time-consuming responsibilities to evaporate into thin air." 636 F.Supp. 1395, 1399 n. 5 ( D.R.I. 1986). Three other positions were eliminated at the same time Ms. Hartman's was. *Id.* at 1400. In *Franks v. Magnolia Hosp.*, it was undisputed that 71 positions had been eliminated in a reduction-in-force. 888 F.Supp. 1310, 1313 (N.D. Miss. 1995). *DeSimone v. Board of Ed.* involved a § 1983 claim based on a New York law that required the Board of Education to appoint the person who had performed in an abolished position, if the Board created a new position that entailed similar duties. 612 F.Supp. 1586, 1570 (E.D.N.Y, 1985). The court granted summary judgment in plaintiff's favor because it found the "plaintiff's old position and the newly created position were sufficiently similar" to trigger due process requirements. *Id.* at 1571, 1574.

The above cases establish that, for purposes of the reorganization exception, a position is not eliminated if the employer merely creates a "new" position involving substantially similar duties as the "eliminated" position. Accordingly, if the Court finds that the plaintiff's job was not eliminated, no reorganization-in-fact occurred that would allow a government to circumvent due process protections. *Misek*, 783 F.2d at 101. If the plaintiff's job was not eliminated, the inquiry ends.

Plaintiff was wrongfully discharged.  However, if the court finds the plaintiff's position was indeed eliminated, then it must determine whether the plaintiff can show the abolishment of the position was a pretext for terminating a disfavored employee.  *See generally, Campana*, 1094 F.Supp.2d at 1094.  Courts often look to evidence of a larger governmental reorganization or reduction in force to determine whether the abolishment of the position was part of a larger reorganization or whether it was pretext to let go of a disfavored employee.

The reorganization cases have established a variety of non-dispositive factors to consider when determining whether a governmental unit conducted a reorganization-in-fact.  Those factors include:  whether a legislative body acted within its powers "and in the manner prescribed by law," *Miller*, 176 N.W. at 772; *Misek*, 783 F.2d at 100-01; whether the ordinance that terminated the plaintiff had been legally adopted, *Miller,* 176 N.W. at 772; *Unger,* 249 Wis. at 163; whether the legislative body considered case management, financial or budgetary information and whether it had been presented faulty information before resolving to eliminate a position, *Haka v. Lincoln County*, 533 F. Supp. 2d 895, 907, 911-912 (W.D. Wis. 2008); whether two separate departments had been combined, *Campana*, 164 F. Supp.2d at 1087; the amount of time spent considering the reorganization,  *Id.* at 1094, and whether the municipality hired an outside consultant to perform an operations review and suggest personnel or departmental changes, *Limes-Miller,* 773 F. Supp. 1130, 1139 (N.D. Ill. 1991).

For example, in *Limes-Miller*, the Illinois Dept. of Commerce commissioned Touche Ross, a major accounting and consulting firm, to perform an operations review and create a procedures manual. Touche Ross recommended a restructuring that included eliminating the unit in which the plaintiff worked. 773 F.Supp. at 1139. In *Campana*, the city council and staff "had conducted surveys and considered several different organizational structures to try to save money and streamline operations." 164 F.Supp.2d at 1087. In *Duffy v. Sarault*, the government agency created a management task force to study and report on the City's operations. 892 F.2d 139, 141 (1st Cir. 1989). This task force suggested several positions be abolished and several others created. *Id.* Consideration of the reorganization factors is critical, because the reorganization defense is not intended as a mechanism to easily deprive a person of constitutionally guaranteed property. *Misek*, 783 F.2d at 101.

Lastly, the reorganization defense is an affirmative defense and thus the burden of establishing whether a "reorganization in fact" occurred is upon the defendant. *Misek*, 783 F.2d at 101; *Dane County v. McCartney*, 166 Wis. 2d 956, 968, 480 N.W.2d 830 (Ct. App. 1992). A defendant may not simply assert it engaged in a legitimate governmental reorganization and then require the plaintiff to disprove the assertion.

### a. The plaintiff's position was not eliminated

Central to this case, is that the County did not prove Ms. Schulz's job was actually eliminated. On the contrary, it appears to concede it was not. (Def. Br. at 2, 10.) Defendant states a new position was created in the department to provide

juvenile intake services and that the chief intake worker's supervisory duties were given to another employee within the department.  (Def. Br at 2, PFOF ¶ 51.) Defendant offers no evidence that the new position created does not perform substantially the same duties as the old, nor can it: Green County must provide the services outlined in the statute.  Defendant eliminated the only occupied position in the county that handled juvenile intake services.[3]  (PFOF ¶¶ 16-17; P.'s Resp. to PFOF ¶ 39.)  Because the statute requires these services the County had no choice but to re-create the juvenile intake position.  Ms. Schulz's old position and the new position share a primary purpose: to "Provide general intake services for the Juvenile Court, screening children taken into custody."[4] (APFOF ¶ 6.)  At the time the alleged reorganization occurred, the county did not create, re-create or re-write any other job descriptions.  (APFOF ¶ 5.)  Thus, the county did not intend a departmental reorganization; it simply intended to take the juvenile intake position out of the circuit court and place it in the Department.

   b. *No bona fide reorganization occurred*

   Anticipating Plaintiff's argument that her position was not eliminated, Defendant concedes "evidence as to whether a position was actually eliminated can be strong evidence of an illegitimate reorganization," but then concludes this law does not apply in this case, because undisputed evidence shows the juvenile intake

---

[3] There were at least two other employees who filled in for Ms. Schulz, but who otherwise were not available for full-time work.  (P.'s Resp. to PFOF ¶ 39.)

[4] The new job description contains all the duties of the old job description.  Some additional duties listed provide more detail into specific duties that had been performed in the old position but that were not included in that description. (APFOF ¶ 6.)  Other additional duties germane to being part of the CYF Unit require no additional education, qualification or skills.  (*Id.*)

department was moved from the Circuit Court and placed in the Department. (Def. Br. at 10.) Defendant cites no authority for this conclusion. Instead, Defendant likens the present case to *Dane County v. McCartney*, where two county departments were combined and the plaintiff lost his job as a result. In *McCartney*, it was undisputed that Dane County eliminated Mr. McCartney's position, and Mr. McCartney did not claim otherwise. *McCartney*, 166 Wis. 2d at 969. The primary issue that exists in the present case—whether a "reorganization" occurred at all, and whether Ms. Schulz's position was actually eliminated—did not exist in *McCartney*. As such, *McCartney* is inapposite.

*McCartney* involved the highly publicized merger of the Dane County social services department and the community support and health services department, to create the human services department. *Id.* at 959; *see also* Mike Stamler, *Matthews Urges County to Limit Panels' Power,* Capital Times, Feb. 19, 1988 at 20; Mary Balousek, *Social Units Urged to Merge County Agencies Faulted in Report*, Wisconsin State Journal, May 12, 1989 at 1A; Mary Balousek, *Phelps, Ezalarab Differ on County Issues*, Wisconsin State Journal, Mar. 20, 1989 at 1B. The "sweeping reorganization" of the two departments in *McCartney* "had been discussed for years." *Id.* The County's research related to the reorganization included 54 pages of recommendations from two independent consulting firms and a task force report issued by a University of Wisconsin professor. Balousek, Wisconsin State Journal, May 12, 1989 at 1A . Both the consultants and the task force found serious flaws in the way the County was providing services to the community. *Id.* Prior to the

reorganization, the merged departments were directed to create a "system of joint planning, budget review and evaluation procedures." Stamler, Capital Times, Feb. 19, 1988 at 20. The reorganization's blueprint was established well before the County board voted to fundamentally change the way in which Dane County would supervise, administer, and deliver social services.

In contrast, Green County's only research into whether the Department could provide the statutorily required juvenile intake services was during a twenty-minute, illegally closed session meeting of the County's Personnel Committee, in which the committee first excluded Ms. Schulz and then interviewed Ms. Miles and Greg Holcomb to inquire whether the Department could handle the additional duties. (APFOF ¶¶ 81-93.) The County has not produced any documentation that would tend to show the Department could provide the services or that transferring services would save any money. When asked to produce all documents related to studies, analyses, consultations, meetings, comparisons or reviews related to the relocation of juvenile intake services, the County produced three pages of hand-written post-it notes. (APFOF ¶ 11.)

The present case more closely mirrors *Haka v. Lincoln County*, where the defendant alleged the reorganization defense to wrongful discharge under the False Claims Act and the First Amendment. 533 F.Supp.2d at 898. In denying summary judgment in defendant's favor, this Court considered the following evidence of illegitimacy, making summary judgment inappropriate:

> It is undisputed that no one did any real investigation to determine whether the reorganization would actually bring about the improvements identified in the resolution, that no one attempted to determine whether the [person who would assume Plaintiff's duties] was qualified to head the child support agency and that no one ever seriously considered other options.

*Id.* at 911-12. Also relevant was that a champion of the reorganization—a county board and finance committee member—"did not know what the fiscal impact of his plan would be…, failed to support the resolution with any financial, budgetary or case load data," and provided the board with incorrect financial projections. *Id.* at 905-06.

As in *Haka,* the demonstrable absence of evidence to support the stated reasons for the termination of Ms. Schulz's employment would permit a reasonable jury to conclude that the stated reasons were pretextual. Moreover, the evidence in the record is sufficient to permit a reasonable juror to conclude that the County's action was taken in bad faith to remove Ms. Schulz from her position as Green County's chief intake worker. The evidence includes, for example, the unprecedented attempt to get Judge Beer to discipline Ms. Schulz when she was out for a medical emergency; Ms. Miles communications with County decision makers questioning Ms. Schulz's ethical conduct; the statement by the county board chair that the county needed more oversight of Ms. Schulz; the county's insistence that Ms. Schulz be denied seniority, despite having allowed seniority to a part time juvenile intake worker who transferred into the Department; the unwillingness of County decision makers to even consider Ms. Schulz's suggestions for budget

savings and for consolidating on-call functions, despite their claim now that their goal was simply financial; and Ms. Miles' statement that there was no need in early October 2008 to consider consolidating on-call functions because it was "moot," that is, the transfer of the function was a done deal. *See* APFOF ¶¶ 107-119.

In addressing budgetary and personnel issues, Green County explored no option other than the action taken, which it alleged *required* removing the plaintiff from her position. (APFOF ¶ 16.) Judge Beer's and Ms. Schulz's and District Attorney Luhman's attempts to cooperate with the Department to resolve both the financial and personnel issues related to the on-call system were ignored. (P.'s Resp. to PFOF ¶¶ 36, 40, 53, 64.) Failure to explore options that would have retained the plaintiff is evidence the County intended to remove her from office. *See, e.g. Campana*, 164 F.Supp.2d at 1083-84 (city considered at least three different organizational structures).

Next, Green County did not consider how the juvenile intake function would be supervised. The Wisconsin statutes require a chief intake worker to supervise the other workers, when the county employs more than one worker. Wis. Stat. §§ 48.06(3), 938.06(3). Before the transfer, Ms. Schulz had acted at the chief worker. (PFOF ¶ 12.) Supervising the juvenile intake department as a whole was Circuit Court Judge Beer. (PFOF ¶ 11.) There is no evidence the county board ever considered who would act as the chief worker, or whether taking the supervisory duties away from the Circuit Court Judge (who is paid by the state) would have a negative fiscal impact upon the County. (P.'s Resp. to PFOF ¶¶ 11, 51.) The record

before the county board (as expressed in meeting minutes) is devoid of these considerations.  (*See* PFOF ¶ 44.)  Quite possibly, Ms. Miles appointed herself chief.  Yet, even if the County had addressed the supervisory responsibility, there is no evidence the County reviewed Ms. Miles qualifications to determine whether she was qualified to serve as the chief intake worker or supervise the intake services.[5] (P.'s Resp. to PFOF ¶ 51.)  Ms. Miles has rarely if ever performed the juvenile intake function, did not know what paperwork was required, and did not know the procedures that must be followed when removing a child from his or her home and placing that child into custody.  (*Id.*)

> Juvenile intake is not an easy position to learn.  You have liability, you have the law, you have policies and procedures.   Taking someone's child into custody is a serious business that you need training on, that you can't just do willy-nilly.  You have to know what you're doing.  So it takes time to be a good intake worker and to be able to put all those pieces together.

(Schulz Dep. p. 91.)  Not only was the County's lack of consideration related to the supervisory responsibilities indicative of illegitimacy, it affects the community of people in need of juvenile intake services.

Lastly, the County's alleged cost-savings presented to the Personnel Committee and full board was unsupported by any financial data or other evidence, and provided no explanation for the alleged cost-savings.  The Personnel Committee and full board passed this resolution without demanding such evidence, when on its face, the alleged cost-savings was patently unreasonable.

---

[5] It is possible the County addressed these issues during the illegally closed session of the personnel committee, discussed in Section II. C., *infra*.

The County's Finance Director prepared a one-page document alleging a $78,746 savings if juvenile intake services were performed by the Department.  (P.'s Resp. to PFOF ¶ 42; APFOF ¶ 27.)  This document was presented at the October 29, 2008 Personnel Committee meeting, and was the only financial information the board reviewed before enacting the resolution.  (*Id.*)  Among the most questionable cost-savings allegations are those related to regular payroll (salary), overtime, mileage, and insurance.[6]

First, one primary reason the County transferred juvenile intake services to the department was because one person could not handle the juvenile intake workload, (P.'s Resp. to PFOF ¶ 52) yet the proposed budget at the Department only budgeted one salary to handle all of juvenile intake. (APFOF ¶ 27).  Moreover, at the circuit court, Judge Beer's time spent supervising the juvenile intake department was on the State's dime.  (P.'s Resp. to PFOF ¶ 11.)  After the transfer, the county must pay Ms. Miles—an hourly employee who is entitled to overtime pay—for her role in supervising the juvenile intake department.  (APFOF ¶¶ 33, 34.)  Related to the salary are fringe benefits, which are calculated using a percentage of the regular payroll.  (APFOF ¶ 38.)  If salary increases, fringe benefits increase proportionally.  The reasonable inference that can be drawn is that the Committee was aware the proposed Department salary budget was inaccurate.

---

[6] Plaintiff's Statement of Additional Findings of Fact provides a very detailed, line-item accounting that demonstrates the alleged juvenile intake budget for the Department was unreasonable.  (P.'s Add'l PFOF ¶¶ 20-80.)

Second, the County was concerned with the amount of overtime Ms. Schulz accumulated, but did not look into the causes of overtime in the juvenile intake department, and thus relied upon a solution that had no chance of reducing overtime. Overtime occurs in the juvenile intake department when a worker is required to perform an intake function outside of normal business hours, or between about 5:00 pm and 8:00 am. (APFOF ¶ 39.) Overtime for a juvenile intake worker depends upon the number of calls the on-call worker receives, the amount of time it takes to respond to the call, and any court appearances that extend outside normally scheduled business hours.[7] (APFOF ¶ 40.) At the circuit court, Ms. Schulz accumulated overtime for emergency situations relating to custody of children. (APFOF ¶ 44.) She accumulated little if any overtime as it related to paperwork or other intake duties of her office. (*Id.*) Because overtime is accrued whenever a worker must respond to an emergency outside of normal business hours, the only way to reduce over-time pay would be to employ a juvenile intake worker whose normally scheduled hours are between 5:00 pm and 8:00 am and 24 hours on the weekends, or require employees to forfeit the equivalent of their normally scheduled hours to make up for the time spent handling emergencies.[8] (APFOF ¶¶ 42-43, 51-54.) Neither of these options were implemented at the Department. (*Id.*) Had the

---

[7] Per the ASFCME Unit 1162-A collective bargaining agreement, "Employees called out to work at a time not consecutive with their regular schedule of hours shall receive the equivalent of a *minimum* of two (2) hours of wages, either as compensatory time or pay." (APFOF ¶¶ 49, 50.) Ms. Schulz was not subject to this contract at the circuit court. (*Id.*)

[8] Green County recently moved its emergency management ("EMS") department from the Veteran's Services to the Sheriff's Department. (APFOF ¶ 101.) One of concerns was EMS overtime. (APFOF ¶ 52.) At the Sheriff's department, there were employees whose regularly scheduled hours are between 5:00 pm and 8:00 am., and those employees were available to handle emergencies that occur after hours without incurring overtime pay. (APFOF ¶ 53.)

County diligently examined the juvenile intake overtime issue, it would have realized the proposed solution was incapable of delivering the alleged savings.

Third, the County alleged it would save several thousand dollars on mileage if the Department administered juvenile intake services.  Mileage for the juvenile intake worker occurs when the worker is required to travel somewhere to perform a juvenile intake function.  (APFOF ¶ 64.)  Mileage for juvenile intake is directly proportionate to the number of open cases.  (APFOF ¶ 65.)  The only way to eliminate juvenile intake mileage would be to perform fewer services.  (APFOF ¶ 67.)  Failing to perform the services would violate the Wisconsin Statutes.  Ms. Schulz explained to the Personnel Committee how mileage for juvenile intake is calculated, yet the County has presented no evidence to show the Committee demanded documentation or explanation from the Department to explain how it would achieve estimated the cost-savings for mileage.  (APFOF ¶ 68.)  In actuality, the cost-savings was based on utter speculation.  At deposition Ms. Miles could provide no basis for her estimate that juvenile intake mileage would be lower in the Department, other than to state that she could not imagine anyone in her unit having $7,200 in mileage.[9]  (APFOF ¶ 72.)  From these facts, a jury could conclude the alleged cost-savings on mileage was erroneous.

Lastly, the county estimated transferring the juvenile intake services would create a $900.00 savings on liability insurance premiums.  (APFOF ¶ 78.) Green County holds one liability insurance policy covering all County departments.

---

[9] Ms. Miles later stated that one of her employees did incur this much mileage.  (APFOF ¶ 73.)

(APFOF ¶ 75.) Each County department pays a percentage of the premium. If the County eliminates one department, the County's premium does not change. (APFOF ¶ 77.) Either the County Finance Director or someone on the board should have realized this alleged cost savings was inaccurate. The lack of attention to detail is indicative of an illegitimate reorganization.

The Defendant contends the alleged cost-savings was accurate, because in June of 2009, it transferred $74,633 to the County's General Fund, which represents the cost-savings on juvenile intake. (Def. Br. at 13.) If, however, at the end of the fiscal year, a County department is over-budget, the County transfers money from the General Fund to that department. (P.'s Resp. to PFOF ¶ 63.) For example, in March of 2009, the Finance Committee authorized transfer of over $100,000 from the General fund to the Human Services Department, to cover the Department's 2008 budget shortfall. (*Id.*) Second, the Department did not provide the Finance Committee with any documents to support the estimate that it only spent the equivalent of one person's salary on juvenile intake services for 2009, and at that time, nobody had calculated the amount of time the Department had devoted to juvenile intake. (APFOF ¶¶ 20-26.) Third, the CYF Unit, which absorbed the juvenile intake function, was significantly over-budget in the three other areas of estimated cost savings: overtime (between $3,300 and $9,280 over-budget), office supplies (between $873 and $1,778 over-budget), and mileage (between $6,000 and $8,712 over-budget). (APFOF ¶¶ 56, 63, 74.) The County Finance Director testified

that is possible these amounts reflect money spent on juvenile intake that were not attributed to the juvenile intake account.  (APFOF ¶ 26.)

The plaintiff does not dispute that the County has likely saved approximately $10,000 as a result of consolidating the CYF Unit and juvenile intake "on call" systems.  This fact is immaterial, however, because this change did not require the county to terminate Ms. Schulz.  *See* P.'s Resp. to PFOF ¶ 53.

The only other possible cost-savings is the fact that the county formerly paid Ms. Schulz $26.99 per hour in 2008 to perform a function similar to what they hired her to perform in 2009 for $19.27 per hour.  The County asserted in its brief that one reason for removing for Ms. Schulz was to create new a position at a lower salary. (Def. Br. at 3.)  This in itself is unlawful.  By definition, that is not an allowable cause under Wis. Stat. §§ 17.10(6)(b)1 and 17.001 (defining "cause" as inefficiency, neglect of duty, official misconduct, or malfeasance in office).  A municipality may not terminate a for-cause employee because that employee is highly paid.  If that were the case, a County would have carte blanche to terminate any for-cause employee under the guise of a legitimate cost-cutting measure.  Moreover, any savings due to the lower hourly rate was not a purpose of the transfer, but instead a result the County mistakenly believed was a necessary consequence of the action.  (P's Resp. to PFOF ¶ 40.)

Admissible evidence demonstrates the county had no basis for believing the cost-savings alleged could be achieved, the unsupported, one-page of accounting provided to the county was facially inaccurate, and in actuality, the county cannot

demonstrate it achieved the estimated cost savings.  The Defendant's motion should be denied.

c. *The resolution transferring juvenile intake services was voted on pursuant to an illegal meeting*

Reorganization cases have also placed emphasis upon whether a legislative body acted within its powers "and in the manner prescribed by law."  *Miller*, 176 N.W. at 772; *Misek*, 783 F.2d at 100-01.  Whether the governmental entity acted legally has generally been addressed in the context of directing courts to avoid considering the subjective motivations of individual or collective county board members; however, a court may consider illegal procedures employed by the legislative body when determining whether a reorganization-in-fact did or did not occur.  *Thein*, 281 N.W. at 655-56.   In this case, the County's Personnel Committee voted to recommend the resolution that terminated Ms. Schulz pursuant to an illegally closed meeting.

The Wisconsin open meeting law requires that every meeting of a governmental body be held in open session unless specifically exempted under the open meetings law.  Wis. Stat. §§ 19.83(1), 19.82(1).  One of these exemptions is found under § 19.85(1)(c), which states a governmental body may consider in closed session the "employment, promotion, compensation or performance evaluation data of any public employee over which the governmental body has jurisdiction or exercises responsibility."  The law also provides that "[n]o business may be taken up at any closed session except that which relates to matters contained in the chief

24

presiding officer's announcement of the closed session." Wis. Stat. § 19.85(1). The
Wisconsin Attorney General has interpreted § 19.85(1)(c) to be limited and narrowly
construed to considerations of employment, compensation, promotion and
performance evaluations of *a specific employee or employees*, and not to general policy
considerations. 80 Wis. Op. Atty. Gen. 176 (Feb. 25, 1992), 1992 WL 528441 (Wis.
A.G.)(emphasis added). This exception does not apply where personnel or
management policies are discussed generally. *Id.* (citing 49 Op.Att'y Gen. V (1960)).
The purpose of the exception is "to protect a particular employee who is being
considered or discussed and not to protect the public agency involved." *Id.* On the
contrary, "The mere fact that items of public policy or future personnel relations are
to be discussed is not a sufficient reason for a secret meeting. It is, in fact, a reason
for holding an open meeting." *Id.*

The County Personnel Committee discussed transferring the juvenile intake
services only twice. The first time was during an open session on October 29, 2008,
in which several people spoke and submitted written comments against the transfer.
(PFOF ¶ 43.) A handful of persons expressed concern over the Department's ability
to provide juvenile intake services. (APFOF ¶ 81.) The Personnel Committee next
addressed the juvenile intake position in closed session during its November 19,
2008 meeting. (APFOF ¶¶83-84.)

The November 19, 2009 Personnel Committee minutes indicate the committee
went into closed session pursuant to Wis. Stat. § 19.85(1)(c). (APFOF ¶ 83.) Ms.
Schulz, who attended the meeting, was asked to leave for the closed session, and

Ms. Miles, along with her supervisor Greg Holcomb, stayed for the closed session. (APFOF ¶ 86.)  While Ms. Miles testified that she believed the purpose of the closed session was to discuss her performance, the committee actually addressed the CYF Unit's general ability to absorb the juvenile intake function, whether the unit could adequately respond to requests from law enforcement officials, and whether or not a conflict of interest existed between juvenile intake custody decisions and her unit's budget.  (APFOF ¶¶ 85-93.)  One committee member characterized the closed session as means to get representatives from Human Services in to get their follow up to criticisms made about the Department in general during the October 29, 2008 meeting.  (APFOF ¶ 84.)  Immediately after reconvening in open session, the committee voted to transfer the juvenile intake functions, thus terminating Ms. Schulz's employment.  (APFOF ¶ 92-93.)  The actual discussions that occurred during the closed session were general policy discussions related to a county department's ability to handle additional duties.  (APFOF ¶¶ 87-89.)  Because the Personnel Committee did not address the work performance of an individual, the session was improperly closed.  (APFOF ¶ 91.)  Even if Ms. Miles at some point during the closed session were asked to defend her own performance, it is clear that general policy and structural matters dominated the meeting.  The Defendant's failure to "act in a manner prescribed by law" in itself precludes summary judgment in its favor.  *Miller*, 176 N.W. at 772; *Misek*, 783 F.2d at 100-01; *Thein*, 281 N.W. at 655-56; *Unger*, 249 Wis. at 163.

In support of its reorganization defense, Green County contends the following:  1) juvenile intake duties were moved from the circuit court to the county human services department, 2) the county consolidated its statutorily mandated juvenile intake on-call service with the CYF's unit's newly created discretionary on-call service,  3) the County hoped to save money by enacting the transfer, and 4) the county hoped to eliminate the need for a part-time juvenile intake worker.  Plaintiff does not dispute that the county was authorized by statute to move juvenile intake duties from the circuit court to the Department, and does not dispute the County consolidated two on-call systems.  These two items alone, however; do not demonstrate the county engaged in a *bona fide* reorganization such that it was justified in terminating her.  Indeed, even if all four items were undisputed they would be insufficient to invoke the reorganization exception because the termination of the court-attached juvenile intake worker was not necessary for the transfer of the function to the Department.  The most logical inference based on the facts is that Ms. Schulz was wrongfully removed from office.

**III.    The County removed the Plaintiff from office**

Lastly, the defendant argues Ms. Schulz was not removed from her position, because after the county had terminated her, she applied for and was hired to perform juvenile intake services for the county, with no break in service.  (Def. Br. at 14.)  To support its argument, Defendant contends Ms. Schulz was actually demoted, and thus not entitled to any due process protections.  (*Id.* at 15.)  Genuine and material evidence suggest Ms. Schulz was terminated and not demoted.

27

After the resolution eliminating Ms. Schulz's position passed the Personnel Committee, Judge Beer wrote to Harvey Mandel asking if Ms. Schulz would be offered the "new" position in Human Services.  (APFOF ¶ 94.)  Mr. Mandel did not respond to him, and could offer no explanation as to why he outright ignored a simple question posed by the County's circuit court judge.  (*Id.*)

After the resolution passed the full board Ms. Schulz applied for the "new" juvenile intake job as was necessary to mitigate her damages.  (PFOF ¶ 57.)  Notably, the county listed the new position as a grade 61 or 62 because they county did not know who would end up being hired into the new position. (APFOF ¶ 96.)  Ms. Miles had encouraged a member of the bargaining unit to post into the position, but that person declined.  (P.'s Resp. to PFOF ¶ 55.)  No other bargaining unit members posted in, and the County has provided no evidence it received an application from anyone besides Ms. Schulz.  (*Id.*)  Ms. Schulz was required to wait out a five day union posting period, complete a full application, and endure a two hour interview. (PFOF ¶ 55; P.'s Resp. to PFOF ¶ 58.)  After she was hired, she was subject to a 90 day probationary period.  (APFOF ¶ 98.)

At the time Ms. Schulz applied for the Green County position, she applied for other jobs.  (APFOF ¶ 97.)  The County concedes it did not guarantee her the job and actually alleges it had to terminate her because the position was being placed in the union, and the union required a posting to its members.  (APFOF ¶ 17, 95; PFOF ¶ 54.)  However, Mr. Morgan testified that a juvenile intake position at human services *did not* have to be part of the bargaining unit and that the County sought assurances

28

it was allowed to put the position in the union. (P.'s Resp. to PFOF ¶ 54.) Further, the County's interpretation of the collective bargaining agreement itself was erroneous. The agreement only requires posting to bargaining unit members when a vacancy occurs. (*Id.*) If Ms. Schulz were transferred with the position she'd spent eleven years in, there would not have been a vacancy. (*Id.*) It was the County's termination of Ms. Schulz that created the vacancy.

The fact that Ms. Schulz's employment was ending caused her a tremendous amount of distress. (APFOF ¶ 100.) At that time, one of her primary concerns was maintaining her employer-provided health care for her and her children. (*Id.*) The uncertainty surrounding this issue alone placed undue stress upon Ms. Schulz. (*Id.*)

Lastly, the county took all Ms. Schulz's eighteen years of seniority (for lay-off purposes) away upon being hired in the Department. (APFOF ¶ 113.) Mr. Morgan testified that when a county employee transfers into a bargaining unit of a union, that person's seniority date for purposes of lay-off is the date they began working in the new bargaining unit. (APFOF ¶ 109.) He testified that this is the case even when a member of one bargaining unit transfers into a new bargaining unit of the same union. (*Id.*) However, the county did not apply this policy to a county employee who had been hired into a vacant position in the 1162-A bargaining unit four months prior to Ms. Schulz. (APFOF ¶¶ 110-114.) The reasonable inference drawn from this is that the reorganization was pretext to remove a disfavored employee.

The County argues it was required to remove Ms. Schulz from office because the union contract prohibited transfer of an employee, yet argues it did not remove

her from office at all.  The County cannot have it both ways.  The most reasonable
inference based on the facts is that Ms. Schulz was removed from office within the
meaning of Wis. Stat. § 17.10.

## CONCLUSION

At its core, this case is not about whether Green County reorganized its
juvenile intake department.  It's about whether the Plaintiff suffered a constitutional
deprivation as a result of wrongful discharge.  Any Wisconsin county may
reorganize at will, but must do so within the bounds of various state statutes that
place burdens and responsibilities upon counties, including chapters 59, 48, 938 and
17.  Plaintiff does not dispute that Green County was authorized by statute to place
its juvenile intake services in the Department; Plaintiff claims she was wrongfully
discharged when the County did so.

The cases are clear:  a municipality cannot "cry reorganization" and have it be
so.  Defendant claims it was interested in cutting costs.  This is a legitimate concern
but hardly a unique one; one would be hard-pressed to find any municipality in this
State that has no cost-cutting concerns.  The County was concerned with insuring
continuation of juvenile intake services in the event the intake worker was absent.
Again, this is a legitimate concern, but the county's response of terminating the
person who had provided those services for eleven years was unnecessary, unfair,
and counterproductive.  It also unconstitutionally took Ms. Schulz's property
without due process of law.  Because the Defendant did cannot prove it actually
eliminated Ms. Schulz's position, and because it cannot prove it engaged in a *bona*

*fide* reorganization that actually included the elimination of Ms. Schulz's position, summary judgment in its favor is inappropriate, and Defendant's motion should be denied.

Respectfully submitted on February 26, 2010.

GARVEY MCNEIL & ASSOCIATES, S.C.
Attorneys for Plaintiff

/s/ Anne Bensky
Anne Bensky, SBN 1069210
One Odana Court
Madison, WI 53719
Telephone: 608-256-1003
Facsimile:  608-256-0933
Bensky@gmmattorneys.com


LAW OFFICE OF LAWRENCE BENSKY, LLC.
Attorneys for Plaintiff

/s/ Lawrence Bensky
Lawrence Bensky, SBN 1017219
10 E. Doty St., Ste. 800
Madison, WI 53701
Telephone: 608-204-5969
Facsimile:  608-204-5970
lbensky@benskylaw.com